UNITED STATES of America,
Plaintiff-Appellee,

v.

William Wesley PRUITT, a/k/a Buddy
Pruitt, Kim Curtis Danner,
Defendants-Appellants.

No. 84–7530.

United States Court of Appeals,
Eleventh Circuit.

June 21, 1985.

---

5. The defendants do not raise any alternative basis for affirming the district court's dismissal of the case.

**1258**

David Cromwell Johnson and Daniel J. Burnick, Birmingham, Ala., for Pruitt.

James S. Witcher, Jr., Birmingham, Ala., for Danner.

Frank W. Donaldson, U.S. Atty., Bill L. Barnett and Robert J. McLean, Asst. U.S.

Attys., Birmingham, Ala., for plaintiff-appellee.

Before VANCE and JOHNSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

JOHNSON, Circuit Judge:

William Wesley Pruitt and Kim Curtis Danner appeal from their convictions for multiple violations of the federal drug laws. Because we find no merit in any of their claims, we affirm.

## I. STATEMENT OF THE CASE

### A. The Facts

In the spring of 1981, William Wesley Pruitt developed a scheme for inducing doctors to write prescriptions for Dilaudid pills, which he then sold in a number of "shot houses" he controlled in Huntsville, Alabama. According to this scheme, Pruitt sent a team of three assistants to a doctor's office: one serving as a driver, the second as "old man" and the third as "daughter." The driver would take the others to a doctor's office, often in a distant state, and would handle all money and the pills acquired during the trip. The daughter would explain to the doctor that her father (the "old man") was a terminal cancer patient who was new to town and needed a prescription for his pain. If this scheme was successful, the doctor then made out a prescription for Dilaudid, which was taken back to Pruitt and sold.

Using this plan, referred to by Pruitt and his associates as "making doctors," prescriptions were secured from physicians in Iowa, Missouri and other areas. The Dilaudid tablets were sold first from Pruitt's own house on Rison Avenue and then from two "shot houses," which were run by Randy Tims and Kim Danner. These shot houses were supplied by "distribution centers" which included Danner's apartment at Haystack Apartments. Pruitt's first "daughter," Thelma Guerin, worked from

spring 1981 to fall 1982, and was accompanied on at least one trip by "driver-banker" Kim Danner. Among the others who participated in "making doctors" were Jimmy Harbin and Laura Blann (referred to as the "king and queen of Dilaudid"), Jackie Morrow, Pruitt's wife Bobbie Jean, and Patricia Yarbrough, who later cooperated with the FBI and testified at trial. Many of these assistants were addicted to Dilaudid and purchased it from Pruitt, or drove shop-lifters around in Huntsville to steal items that Pruitt would exchange for Dilaudid pills.

Both the FBI and the Madison County Sheriff's Office became involved in the investigation of Pruitt's activities. Theresa Hodges, a minor who was working for the Sheriff's investigation, purchased a Dilaudid pill from Pruitt at his apartment at Rison Avenue. She was forced to swallow it before she left the house. The next time she went to see Pruitt, she was sent to one of his "shot houses," where she bought a Dilaudid pill, which she brought to the Sheriff's Office. At least one other individual purchased Dilaudid pills from Pruitt in the course of cooperation with law enforcement officials.

The FBI investigation was coordinated by Agent Richard Sams. Sams arranged a sale of drugs to Pruitt that culminated in his arrest at the Huntsville Jetport. During the negotiations for the sale of drugs to Pruitt, which were conducted at Pruitt's house, Pruitt introduced Sams to Kim Danner. Danner also accompanied Sams and Pruitt to the airport to consummate the sale, during which time conversations among the men were taped by Sams. In response to a statement by Sams that he did not trust Danner, Pruitt replied, "That's one of my people you got here, see? He sells for me." Pruitt also remarked at one point during the trip to the airport that Danner was getting "scared," and that Danner didn't like "being behind the gate" at the airport.

B. Course of Proceedings

On April 19, 1984, Pruitt, Danner and thirteen other individuals were charged in an eleven-count indictment. On May 11, 1984, counts 5, 6, and 7 were dismissed. Count 1 charged Pruitt with conducting a continuing criminal enterprise participating in the sale of controlled substances, in violation of 21 U.S.C.A. § 848. Counts 2, 3, and 4 charged Pruitt and Danner with violating 21 U.S.C.A. § 841(a)(1) and 18 U.S.C.A. § 2, by possessing with the intent to distribute various controlled substances. Count 8 charged Pruitt with violating 21 U.S.C.A. §§ 841(a)(1) and 845 and 18 U.S.C.A. § 2, by knowingly and intentionally distributing a controlled substance to a person under 21 years of age. Count 9 charged Pruitt with violating 21 U.S.C.A. § 841(a)(3), by knowingly and intentionally distributing and possessing with intent to distribute a controlled substance. Count 10 charged Pruitt and Danner with entering into a conspiracy with intent to distribute a controlled substance, in violation of 21 U.S.C.A. § 846. Count 11 charged Pruitt with violating 18 U.S.C.A. §§ 2 and 1952, by aiding and abetting interstate travel to promote unlawful activity.

On June 26, 1984, Pruitt, Danner and three others proceeded to trial. Danner's motion for severance, filed May 4, 1984, had been denied by the magistrate on May 16, 1984. On July 6, 1984, Powell, a co-defendant, entered a plea of guilty. On July 13, 1984, the jury found Pruitt guilty on all counts except Count 11; the jury found Danner guilty as charged. Tex Lang, one of the co-defendants, was acquitted of all charges.

On July 24, 1984, Pruitt and Danner were sentenced. Pruitt received: on count 1, life imprisonment and a fine of $100,000; on count 2, fifteen years' imprisonment and a fine of $25,000, both to run concurrent with count 1; on count 3, five years' imprisonment and a special parole term of twenty years, to run consecutive to count 2 and concurrent with count 1; count 4, three years' imprisonment and a special parole term, to run consecutive to counts 2 and 3 and concurrent with count 1; count 8, fifteen years' imprisonment and a special parole term of twenty years, to run consecutive to counts 2, 3, and 4, and concurrent

with count 1, and a fine of $25,000 concurrent with count 1; count 9, fifteen years' imprisonment and a special parole term of 20 years, consecutive to counts 2, 3, 4, and 8 and concurrent with count 1, and a fine of $25,000 concurrent with count 1. Danner received: fifteen years on count 2, five years on count 3, three years on count 4, fifteen years on count 10, and a parole term of fifteen years, all sentences to run concurrently.

## II. PRUITT'S CLAIMS

### A. Contradictory Jury Charge

Instructing the jury concerning the counts with which Pruitt was charged, the court stated:

> If you find beyond a reasonable doubt that during the time period charged in Count One, that the defendant Pruitt committed other offenses of possessing controlled substances with intent to distribute them, not specifically charged in those said counts of the indictment [2, 3, 4, 8, 9 and 10], you may consider such offenses, if any, in determining whether the violations charged in said counts two, three, four, eight, nine and ten were connected together as a series of related or ongoing activities as distinguished from isolated and disconnected acts.

Immediately following this instruction, the court stated:

> Now, as I have told you several times, a separate crime or offense is charged against one or more of the defendants in each count of the indictment. Each offense and the evidence pertaining to it should be considered by you separately. The case of each defendant should be considered separately and individually. The fact that you may find one or more of the accused guilty or not guilty of any of the offenses charged should not control your verdict as to any other offense or any other defendant.
>
> I caution you that you are here to determine the guilt or innocence of the accused from the evidence in this case. The defendants are not on trial for any act or conduct or offense not alleged in the indictment. Neither are you called

upon to return a verdict as to the guilt or innocence of any person or persons not on trial as a defendant in this case. Pruitt argues that the conflict between the instruction that non-charged acts may be considered in establishing continuity between charged acts and the instruction that defendants are not on trial for any offense not alleged in the indictment was sufficiently irreconcilable to confuse the jury and deprive him of a fair trial.

■ As the law of this Circuit makes clear, it is not sufficient simply to demonstrate that an instruction had the potential to confuse a jury. Appellant must raise "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations," *Houston v. Herring*, 562 F.2d 347 (5th Cir.1977), and demonstrate that "the ailing instruction by itself so infected the entire trial that the resulting conviction violated due process." *Potts v. Zant*, 734 F.2d 526 (11th Cir.1984); *United States v. Russell*, 717 F.2d 518 (11th Cir. 1983); *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

■ Appellant's claim clearly falls short of the relevant standards. First, Pruitt does not persuasively demonstrate that the two portions of the instruction are contradictory. Considering uncharged offenses in order to determine whether the charged offenses were related in a continuous pattern of criminal activity is not the same as, or even similar to, placing defendants on trial for offenses not included in the indictment. The jury simply uses the uncharged acts as evidence to evaluate the relationship between the charged acts; the acts for which the defendants are "on trial," and for which they must ultimately be convicted, are the acts enumerated in the indictment. Instructions which can so easily be reconciled are distinguishable from those in the cases relied on by appellant, which leave the jury no means of deriving consistent guidance. *See e.g. Thomas v. Leeke*, 725 F.2d 246, 248 (4th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984) (instructions stated state was "bound to prove every material allegation

or claim of the indictment beyond every reasonable doubt" and defendant "must establish the plea of self-defense by the preponderance or greater weight of the evidence"); *Houston v. Herring, supra,* 562 F.2d at 348–49 (court accompanied strict liability instruction with instruction stating "unless the Plaintiffs have proved, by a preponderance of the credible evidence in this case, that their injuries, if any you find, were proximately caused by the negligence of the Defendants, it is your sworn duty to return a verdict for the Defendant ...").

Even if one could agree that the instruction had the potential to confuse the jury, appellant is unable to demonstrate that it so infected the proceeding as to deprive him of a fair trial. The instruction in the instant case does not implicate the burden of proof, the failure of a defendant to testify or any other feature of the trial which is protected by a constitutional guarantee. *See Thomas v. Leeke, supra,* (conflicting instructions relating to burden of proof). Because the conflict with constitutional protections is not implicit in the nature of the instruction itself, it is incumbent on appellant to demonstrate how this allegedly confusing instruction affected the fundamental fairness of his trial. Not only does he fail to make such a showing, it is difficult to imagine how such a showing could be made with respect to the contested instruction. Even if the instruction were contradictory, fundamental unfairness to the defendant would not arise from reliance on either part of it. If the jury were to follow only the portion stating that defendants were not to be tried for uncharged acts, they might not consider the uncharged acts in evaluating the continuity of the charged acts; but this would, in the most extreme case, result only in an acquittal of appellant on count 10. If the jury, on the other hand, were to follow only that portion dealing with uncharged acts and

count 10, and neglect that portion of the instruction prohibiting them from trying defendants on uncharged acts, the precise instruction as to how to use the uncharged act evidence in evaluating the charges of the indictment would prevent them from doing anything untoward or prejudicial with that evidence. The instruction thus provides no grounds for reversal.[1]

**B. Jury Instruction on Distribution to Minor**

Section 845 of 21 U.S.C.A. provides that anyone who knowingly or intentionally distributes controlled substances to a person under twenty-one is subject to enhanced penalties. During the course of their deliberations, the jury presented a question to the trial court which read "[d]oes knowingly refer to the age [of the purchaser] or the distribution itself?" After an *in camera* discussion with counsel, the court instructed the jury that it is not an essential element of the crime that the person who distributes be knowledgeable that the person to whom he distributes is under twenty-one years old; it is the distribution that must be knowing, although it is an essential element that the person to whom the distribution is made is under twenty-one. Appellant argues that this instruction was error, because it violated the interpretive principle that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Bingham, Ltd v. United States,* 724 F.2d 921, 924–925 (11th Cir.1984). Appellant argues that knowledge of the age of the recipient of the controlled substance was an essential element of the crime and that the prosecution failed to prove it in this case.

The trial court is vested with broad discretion in formulating its charge, and will not be reversed unless the charge fails accurately to reflect the law. *United States v. Walker,* 720 F.2d 1527 (11th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct.

---

**1.** Appellee claims that this argument should be reviewed under a plain error standard because appellant's counsel failed to object to the instruction when proposed. This claim is lacking in merit. The record reveals that Pruitt's counsel objected to the proposed instruction several times, although his comments were not sufficiently lengthy or specific to determine whether the allegedly contradictory character of the instruction provided the basis for his objection.

1614, 80 L.Ed.2d 143 (1984). There appear to be no cases defining the "knowledge" requirement of Section 845. There is, however, a precise analogue to this statute, 18 U.S.C.A. § 2421 *et seq.* (White Slave Traffic Act), which prohibits the interstate transportation of persons in order to engage in immoral practices including prostitution, and which provides enhanced penalties for the knowing transportation of persons under the age of eighteen years. Under this statute, knowledge of the victim's age is *not an element* of the crime; the "knowing" component applies to the transportation itself. *United States v. Hamilton,* 456 F.2d 171 (3d Cir.), *cert. denied,* 406 U.S. 947, 92 S.Ct. 2051, 32 L.Ed.2d 335 (1972). The same principle has been applied to 18 U.S.C.A. § 2315, which prohibits the knowing receipt of stolen goods moving in interstate commerce: the "knowing" applies solely to the receipt of stolen goods; it is not necessary to demonstrate that the accused knew the goods were moving in interstate commerce. *United States v. Hamilton, supra; Pugliano v. United States,* 348 F.2d 902 (1st Cir.), *cert. denied,* 382 U.S. 939, 86 S.Ct. 390, 15 L.Ed.2d 349 (1965). Similarly, under 18 U.S.C.A. § 2313 (Dyer Act), which prohibits the knowing receipt of stolen cars that have been transported in interstate commerce, it is not necessary to demonstrate that the accused knew that the cars had been transported in interstate commerce. *Pilgrim v. United States,* 266 F.2d 486 (5th Cir.1959). These instances of statutory construction are more closely connected with, and have more bearing on, the instruction given by the court than the general tenet that criminal statutes should be construed with lenity. This precedent demonstrates that the court did not abuse its discretion in giving the charge, and that it was no failing for the prosecution to have neglected to prove that Pruitt knew Theresa Hodges was under twenty-one.[2]

## III. DANNER'S CLAIMS

### A. Motion for Severance

On May 4, 1984, Danner filed a motion for severance, stating that he would be "irreparably prejudiced if tried with the numerous co-defendants." He alleged that certain co-defendants, namely William Wesley Pruitt and Bobbie Jean Pruitt, would be "vital defense witnesses" whose testimony would prove lack of association, cooperation and common purpose. Danner further alleged that both Pruitts would testify in his behalf if they were tried separately from him. This motion was denied by the magistrate. Danner did not challenge this denial or renew the motion at the beginning of the trial. Bobbie Jean Pruitt's case was severed and she was held as a potential witness for the defense; after the trial had commenced, the government asked if anyone planned to use her as a witness. Both counsel for Pruitt *and* counsel for Danner stated that they did not intend to use her as a witness. At the end of the government's evidence, Danner moved once again for severance. Counsel for Pruitt stated that Pruitt would not testify on his own behalf but that, if Danner were granted a separate trial, Pruitt would testify as to counts two through four that "it was his deal and Danner had nothing to do with it on that particular—just the thing with the airport, not the conspiracy." The trial judge stated that if Pruitt were to so testify, he "would find it so incredible as to be beyond the bound of reason ..." Counsel for Pruitt also suggested to the court that Pruitt might have meant that he, Pruitt, was concerned about the car being behind the gate at the airport, when he stated on Sams' recording that Danner was concerned about the car being behind the gate. The trial court stated that this proffer would be on an even higher scale of incredulity. Counsel for Danner adopted both Pruitt's proffers as his own. The court

---

**2.** Appellant also argues that the prosecution did not offer evidence that Pruitt was over eighteen years of age, but appellant's own brief cites a comment by the court which demonstrates that such evidence had been offered ("I just told them awhile ago on that tape, one place Sams asked him, you must have married young and he said, I married when I was twenty years old").

subsequently denied the motion to sever. Danner claims that this denial was error.

■ The grant or denial of a motion for severance lies within the discretion of the trial court and is reviewable only for abuse of discretion. *United States v. Kabbaby*, 672 F.2d 857 (11th Cir.1982). To demonstrate that a trial court abused its discretion in denying a motion for severance, a defendant must demonstrate that he suffered compelling prejudice against which the trial court was unable to afford protection." *United States v. Russell*, 703 F.2d 1243 (11th Cir.1983). If a defendant claims that he was prejudiced by the loss of co-defendant testimony which might have been forthcoming at a separate trial, he must demonstrate: 1) a bona fide need for the testimony 2) the substance of the testimony 3) its exculpatory nature and effect and 4) that a co-defendant would, in fact, testify if the cases were severed. If such a showing is made, the trial court must: 1) examine the significance of the testimony in relation to the defendant's theory of defense 2) assess the extent of prejudice caused by the absence of the testimony 3) pay close attention to judicial administration and economy 4) give weight to the timeliness of the motion. *United States v. Rice*, 550 F.2d 1364 (5th Cir.), *cert. denied*, 434 U.S. 954, 98 S.Ct. 478, 54 L.Ed.2d 312 (1977).

■ It does not appear that Danner made even the showing necessary to place the question of severance properly before the trial court. It is obvious that Danner had a need for testimony that he had "nothing to do" with the conspiracy. But the substance of the testimony and its character as exculpatory evidence were neither fully nor informatively explored by counsel for Pruitt and Danner. In *United States v. Harrell*, 737 F.2d 971 (11th Cir. 1984), the court held that an affidavit by a co-defendant promising testimony at a sep-

arate trial that the appellant "has had no involvement with any controlled substance transactions" was not sufficiently precise or instructive to support a motion for severance. *Id.* at 976. The proffer by Pruitt's counsel, which was not a sworn statement, offered little more information than the affidavit discussed in *Harrell*. It was also unlikely to have great exculpatory value, in light of testimony that Danner ran a "shot house," used his apartment as a shot house distribution center, and accompanied Pruitt to the airport on the day of his arrest.

But even if Danner's initial showing passed muster, an examination of the second four factors demonstrates that the court did not abuse its discretion in denying the motion. Although the testimony was, in theory, relevant to Danner's defense of non-participation in the conspiracy, its loss was, in practice, unlikely to be particularly prejudicial to Danner. The trial judge responded, having heard the government's evidence and Pruitt's counsel's proffers, that he found the proffers incredible; it seems probable that they would have a similarly unhelpful effect on the jury. Moreover, Danner had stated on a previous motion to sever that he would be prejudiced by the loss of the "vital" testimony of Bobbie Jean Pruitt; but when he was given the opportunity to have her testify on his behalf, he declined. This development gave the court legitimate reason for concern that the second motion to sever based on the need for co-defendant testimony might be similarly disingenuous. Given these considerations, and the inefficiencies implicit in a second trial that would have included many of the same witnesses, the district court did not abuse its discretion in denying appellant's motion.[3]

B. Sufficiency of the Evidence

■ Danner argues next that the evidence was insufficient to support his conviction. In order to support the jury verdict "[i]t is not necessary that the evidence

---

**3.** Appellee claims that this argument as well should be reviewed under a plain error standard, as Danner failed to "appeal" the decision of the magistrate or raise the severance question again at the beginning of the trial. This claim is

wholly without merit, as the record shows that Danner moved for severance at the end of the government's evidence and thus preserved the matter for appeal under the abuse of discretion standard.

exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (Unit B en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Possession of a controlled substance with intent to distribute may be proved by circumstantial evidence as well as by direct evidence. *United States v. Bustos-Guzman,* 685 F.2d 1278 (11th Cir.1982). Possession may be actual or constructive; if the accused exercised "some measure of dominion and control over the contraband," either exclusively or in association with others, he constructively possessed it. *United States v. Blasco,* 702 F.2d 1315, 1330 (11th Cir.), *cert. denied sub nom Jamardo v. United States,* —— U.S. ——, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983).

▮ All of the above standards appear to be met by the evidence in the instant case. The evidence revealed not only that Danner had "made" a doctor in the fall of 1982 with Thelma Guerin; that he ran a "shot house," to which Pruitt sent customers; that he supplied that "shot house" with drugs "made" from doctors and stored in his apartment; and that he was present on at least two of the occasions on which Pruitt negotiated a drug deal with Agent Sams, during one of which he was identified by Pruitt as one of his associates. But at least four witnesses, most of them members of Pruitt's operation, testified that they had purchased Dilaudid from Danner at the Haystack Apartments (Danner's home); that Pruitt had been present with Danner on some of these occasions; that Danner had been present at meetings of Pruitt's assistants; and that Danner had been seen taking Dilaudid tablets from Pruitt's apartment for storage at the Haystack Apartments. This evidence was more than sufficient to support the jury verdict.

## C. Sentences

▮ Danner also argues that the court abused its discretion in sentencing him, as his sentence was three times the length recommended by the government *for any co-defendant* except Pruitt, and it failed to take account of his comparative youth, the extent of his role in the conspiracy and his lack of any significant prior criminal record. This argument is wholly lacking in merit. Sentencing is a matter within the sound discretion of the trial court and a sentence imposed will not be reversed unless it is beyond statutory or constitutional limits. *United States v. Allen,* 724 F.2d 1556 (11th Cir.1984). The sentence imposed in the instant case offends no statutory or constitutional limits, *see United States v. Sanchez,* 508 F.2d 388 (5th Cir.) *cert. denied,* 423 U.S. 827, 96 S.Ct. 45, 46 L.Ed.2d 44 (1975) (fifteen year sentence for first time drug offender not cruel and unusual punishment). Nor does it evince a "mechanistic" character or a failure to consider "individual mitigating factors" as alleged by appellant. *See United States v. Wardlaw,* 576 F.2d 932 (1st Cir.1978) (ten year sentences for importation and possession of cocaine imposed on 21 and 23 year-olds with no previous criminal records, strong family backgrounds, and good academic records, as means of sending "message" to larger-scale drug dealers, reversed as lacking in sufficient individuation). As the abundant evidence discussed above demonstrates, Danner was heavily implicated in both the acquisition and the distribution phases of the conspiracy. He appears to have played a larger role than any co-conspirator except Pruitt, who received a life sentence and heavy monetary penalties. In light of these facts, and the fact that the court imposed concurrent sentences for each of Danner's violations where it could have imposed consecutive sentences, it does not appear that the sentences were excessive or mechanistically imposed.

The judgment of the district court is AFFIRMED.