UNITED STATES of America,
Plaintiff-Appellee,

v.

Jimmy Edward TAYLOR, Peter Martin, Sr., Elizabeth King, and Gerald White, Defendants-Appellants.

No. 85-3078.

United States Court of Appeals, Eleventh Circuit.

June 30, 1986.

Thomas John Hanlon, Lopez & Hanlon, Tampa, Fla., for Taylor.

E.C. Watkins, Jr., Tampa, Fla., for Martin.

Charles R. Wilson, Dolores Mendez, Tampa, Fla., for King.

Roger L. Young, Morris Silberman, Sarasota, Fla., for White.

J. Larry Hart, Asst. U.S. Atty., Tampa, Fla., for plaintiff-appellee.

Before HATCHETT and CLARK, Circuit Judges, and ALLGOOD *, Senior District Judge.

CLARK, Circuit Judge:

Elizabeth King, Peter Martin, Sr., Gerald White and Jimmy Edward Taylor appeal from their convictions for kidnapping under

* Honorable Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

18 U.S.C. §§ 1201(a)(1) and (2) and conspiracy to kidnap under 18 U.S.C. § 1201(c).

## I. FACTS

In January, 1981, Valerie Endsley was beaten and kidnapped by her sister, her former lover, and various other acquaintances, who feared that Endsley was involved in a murder plot. This case arises from that kidnapping.

Endsley flew from New York City to Tampa, Florida, on Friday, January 23, to visit her sister, Elizabeth King. James Thomas traveled from Detroit to Tampa on the same day to deliver some jewelry to Peter Martin, Sr. King picked up Thomas and Endsley at the airport and took them to Martin's house, where she also lived.

King and her guests were met at the house by Martin and Gerald White. The entire group sat up talking and using cocaine until sunrise on Saturday morning. Saturday night, Endsley's troubles began when King struck her on the head with a bottle.

On Sunday, White, King and Martin began to discuss their suspicion that Endsley had come to Tampa for the purpose of killing Martin and/or King. Throughout the day, White, King and Martin discussed the so-called "hit" and questioned Endsley about her involvement. She denied knowing anything about any plot to kill Martin. Endsley suffered no violence on this day, but Martin told her, in the presence of White and King, that she could not go back to New York until he had found out more about the hit. White, King and Martin stayed up all night questioning Endsley.

While King, White and Martin played central roles as Endsley's interrogation got under way, others appeared to observe or lend support to the investigation. James Thomas was present throughout the day and night. Willie Thomas arrived sometime in the evening and stayed for an unknown length of time. At some point on Sunday, Lanhandrow McCray brought some guns into the house at Martin's request.

The interrogation of Endsley continued (although not without interruption) on Monday into the evening and, again, overnight. Willie Thomas and McCray were present Monday morning.

At some point, Martin called Jimmy Taylor to come in from Detroit. Taylor arrived on Tuesday bringing three pistols with him. Upon his arrival he immediately began interrogating Endsley in the presence of White, King, Martin and James Thomas. Sometime Tuesday evening, Martin, King, White, Taylor and Willie Thomas began to beat Endsley. Taylor struck her over the head with a pistol. King broke a whiskey bottle over her head. White and Willie Thomas kicked her repeatedly.

When they had tired of beating Endsley, Martin, White, Taylor, King and Willie Thomas went into an upstairs bedroom to talk. After a while they brought Endsley into the room and locked the door. She was later removed from the room dressed in different clothing and Martin, White, Taylor, King and Willie Thomas were present as she was taken out to a camper with her head covered by a field jacket. White and Taylor drove away with Endsley early Wednesday morning.

In their absence, Martin and King interrogated James Thomas, suspicious that he was connected to the plan to kill Peter Martin. Thomas was held at the Martin residence at gun point by Willie Thomas and McCray.

White and Taylor drove to a Holiday Inn outside of Atlanta, Georgia. Because the camper had been giving them trouble, White called Martin in Tampa and a decision was made to return to Tampa. Martin reported to James Thomas, King and Willie Thomas that White and Taylor were near Atlanta and had decided to return. White, Taylor and Endsley arrived back in Tampa at approximately 2:00 a.m. on Friday, January 30. When he walked into the house, White stated that he was tired as he had just driven from Atlanta. Endsley was put to bed and James Thomas continued to be held at gun point.

Later that morning, James Thomas escaped and hid in a neighbor's yard. That neighbor called the police to report a prowler, and Tampa Police Sergeant Jimmy Frederick and Corporal Pricher responded to the call at approximately 5:00 a.m. Frederick and Pricher found Thomas in the neighbor's yard, and he told them about the events of the preceding days.

Going to the Martin residence, the police encountered McCray and Willie Thomas in the yard. King eventually came out. Having been advised of James Thomas' claim that someone in the house had been severely beaten, King claimed that her sister was ill and sleeping in bed. The officers refused to leave before seeing Endsley, and they waited until King and Thomas helped her walk out of the house. She was obviously severely beaten.

An ambulance was called. After Endsley was placed in the ambulance, Corporal Pricher spoke with her for about five minutes. He immediately reported to Frederick that her story "pretty well" corroborated James Thomas' statements. King, Willie Thomas, Taylor, White and Martin were then arrested at the house.

During the state investigation of the kidnapping, Gerald White gave statements to the Tampa police. White's statements revealed that he had participated in the beating and kidnapping and that Endsley had been taken across state lines. Before giving the statements, he was told by assistant state attorney Norman S. Cannella that his cooperation would be reported to a state judge who had just revoked White's probation and sentenced him to fifteen years and that pending state charges arising from the kidnapping would be dismissed if White provided information of sufficient value to warrant such actions.[1] Before admitting anything to the police, however, White signed statements indicating that his statements were given freely and voluntarily and that no promises had

been made to induce his consent to the interview.

After all state charges against the defendants were dismissed or nolle prossed, King, White, Taylor, Martin and Willie Thomas were indicted on federal charges of kidnapping and conspiracy to kidnap and were tried together. At trial, James Thomas testified about events at the Martin house, before and after Endsley was driven to Atlanta. Endsley corroborated much of Thomas' testimony and added testimony about her trip in the van. Inculpatory statements against White and Willie Thomas were introduced against those defendants. Various other witnesses, mostly law enforcement officers, testified against the defendants.

All defendants were convicted on both counts, with Martin and Taylor receiving two concurrent fifteen-year sentences, White receiving two concurrent six-year sentences and King receiving a six-month sentence for the conspiracy conviction and a suspended sentence and three years probation for kidnapping. All defendants except Willie Thomas filed notices of appeal. (Additional facts relevant to the particular allegations of error raised by appellants will be set forth as needed.)

## II. ISSUES

Appellants raise the following issues: (A) whether the district court erred in denying the severance motions of King, Martin and Taylor; (B) whether the district court abused its discretion in denying White's motion to suppress the statements he gave to Tampa police officers; (C) whether White's conviction must be reversed due to the district court's admission of alleged hearsay testimony; (D) whether the district court committed reversible error in denying, without a hearing, Martin's motion to dismiss on the ground of selective prosecution; (E) whether the government's characterization of Taylor as a "hit man" during closing argument requires reversal of his

---

**1.** A discussion between White and Cannella, during which the terms of this "agreement" were set forth, was transcribed and appended to

White's Motion to Suppress. Record, Vol. 1 at 266–273.

conviction; (F) whether the evidence was sufficient to support the convictions of King, Martin and White.

## III. ANALYSIS

### A. *Severance* (King, Martin and Taylor)

Prior to trial King, Martin and Taylor filed motions for severance of their trials from those of their co-defendants, claiming they would be prejudiced in several respects by the joint trial. The district court denied these motions. Taylor renewed his motion just prior to the admission into evidence of a statement given by Willie Thomas that had been redacted to eliminate inculpatory references to co-defendants. As King's motion to adopt the motions of her co-defendants had previously been granted, her severance motion was also effectively renewed. The motions were again denied. King, Martin and Taylor present several reasons why we should hold that the district court abused its discretion in denying severance.

 Fed.R.Crim.P. 14 allows a district court to grant severance of a defendant's trial if it appears that prejudice to the defendant will follow from a joint trial. A motion for severance is addressed to the sound discretion of the district court and will be reversed only if that discretion is abused. *United States v. Pruitt*, 763 F.2d 1256, 1263 (11th Cir.1985). The movant must show specific and compelling prejudice against which the district court was unable to afford protection. *Id.*

 The three defendants argue that the admission of the statements of co-defendants White and Willie Thomas inculpated them and denied their right of confrontation, in violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Prior to the introduction of each statement and again just prior to deliberations, the district court cautioned the jury to consider each statement only with respect to the defendant who gave it. The statements were edited ("redacted") to

ensure that they did not implicate co-defendants. Nonetheless, appellants deny that they were provided sufficient protection against prejudice. They maintain that the district court therefore abused its discretion in denying their motions for severance.

The defendants point out two ways they believe they were prejudiced by the introduction of White's statement. They first contend that White's description of the injuries suffered by Valerie Endsley as a result of the beatings was so shocking that his description of his own participation could not explain it. The jury must therefore have inferred that more than one person participated in the beating. Second, they note that White's statement revealed that he had taken Valerie across state lines, from Florida to Georgia, and so provided the jury with evidence of one element—interstate transportation—needed to convict all defendants of kidnapping under federal law. No specific prejudice arising from the admission of Willie Thomas' statement has been pointed out.

King, Martin and Taylor simply do not demonstrate the kind of specific and compelling prejudice that would require the district court to order separate trials. "For *Bruton* to apply, a co-defendant's statement must be clearly inculpatory standing alone." *United States v. Satterfield*, 743 F.2d 827, 849 (11th Cir.1984). Nothing in the redacted versions of the statements comes close to implicating any specific co-defendant in any element of the offenses charged.[2] In fact, for the most part, the statements do not reveal whether the defendants who gave them acted alone or with someone else. Even if the extent of the beating described by White supports the inference that others participated, the number and identity of the others were not disclosed, and inculpation in the beating would not amount to inculpation in the kidnapping.

---

**2.** Martin is mentioned by name only as a potential victim of a murder plot. This information

is not inculpatory and also reached the jury through James Thomas' testimony.

In any case, all the information revealed by the statements and claimed by King, Martin and Taylor to be prejudicial, including the fact that White transported Endsley from Florida to Georgia, was brought to the attention of the jury through the testimony of James Thomas, which was properly admitted against these defendants. Furthermore, the jury was reminded several times to consider each statement only in deliberating over the verdict of the defendant who gave it. These cautionary instructions should have protected the co-defendants against any juror inclination to transfer guilt from one defendant to the others.

■ King, Martin and Taylor's argument that they were denied the right to confront and cross-examine witnesses by the fact that they were tried with White and Willie Thomas and could not call them to the stand is insufficient to compel severance. *Bruton* does not require severance every time a co-defendant's statement is admitted in evidence during a joint trial, even though joint trial may foreclose any opportunity to cross-examine the defendant who made the statement. We also reject Taylor's contention that the government referred to the statements during closing argument in a way that prejudiced the co-defendants. The record does not show that the government made any improper or prejudicial reference to the statements. For all these reasons, we hold that the district court did not commit any *Bruton* error in denying severance.

Martin argues that there was so little evidence against him as compared to that introduced against his co-defendants that he must have been prejudiced by a transference of guilt from the others to him. Even if less of the evidence was relevant to Martin's guilt, we will not hold that the district court abused its discretion to deny severance merely because there was less evidence against Martin than against the others. *United States v. Michel,* 588 F.2d

986, 1003 (5th Cir.1979), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979).[3] Certainly there was sufficient evidence to sustain Martin's conviction. The mere disproportionality of the evidence provides no ground for holding the district court abused its discretion.

### B. *Motion to Suppress* (White)

Five weeks before trial, White's attorney withdrew from the case. Two weeks later, a Notice of Appearance was filed by substitute counsel. Copies of the evidence that the government intended to use against White, including the inculpatory statements given to Tampa police, were turned over to substitute counsel by the first attorney three weeks before trial. Shortly after the trial began, three days after the jury was sworn, White moved to suppress the statements on the basis that they had been induced by certain promises and were therefore involuntary and inadmissible under the Fifth Amendment.

The district court denied the motion as untimely at the outset of trial. White renewed his motion when the statements were offered in evidence through the testimony of one of the officers to whom the statements had been given. The district court allowed White to proffer his evidence in support of the motion to suppress outside the hearing of the jury. White testified on his own behalf and was cross-examined by the government. White's counsel indicated that he would have called additional witnesses to corroborate White's testimony had he known to be prepared for an evidentiary hearing, and government counsel similarly indicated it was unprepared for a full hearing on voluntariness. After hearing White's testimony, the district court reiterated that the motion was denied as untimely and added that it appeared the statements were voluntarily made. A redacted version of the statements was admitted in evidence.

---

**3.** In *Bonner v. City of Pritchard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

On appeal, White challenges both grounds—untimeliness and voluntariness—for the denial of his motion to suppress. He does not deny that his motion was untimely under Fed.R.Crim.P. 12(b)(3), which requires that a motion to suppress evidence be raised prior to trial. Rather, White argues that the district court abused the discretion placed in it by Fed.R.Crim.P. 12(f) to provide relief from the waiver effected by untimely filing where cause is shown.

We cannot say that the district court abused its discretion. While it *may* have been *permissible* for the district court to consider the motion despite its untimeliness, White has cited no case in which a district court was required to do so under similar circumstances. The "cause" offered by White's attorney—his appearance only three weeks before trial—hardly explains his failure timely to raise the motion to suppress. Surely three weeks is enough time to examine the documents that are to be used against one's client. Moreover, it is unlikely that substitute counsel stepped in without learning anything about the case from White's first attorney, especially about evidence so damaging as a confession to kidnapping. The assertion of cause appears even less convincing when it is considered in light of the fact that White's attorney announced he was ready for trial and urged that the jury be sworn on the first day of trial, although he was given the option to delay the swearing of the jury for several days. He did not then move to suppress the statements for another three days. We are hard pressed to find any "cause" in this set of facts, let alone cause so compelling that we must hold that the district court abused its discretion in refusing to overlook White's waiver under Rule 12(b)(3).

■ We are sympathetic to White's argument that a defendant should not be penalized for the inadvertence of his or her counsel but are at a loss to see how we can hold that a district court must entertain a suppression motion untimely filed due to inadvertence of counsel without completely eviscerating Rule 12(b)(3). Furthermore,

competing considerations of prejudice to the government must be taken into account. Once a jury has been sworn and jeopardy attaches, the government loses its right to appeal an adverse ruling on suppression. *See* 18 U.S.C. § 3731. The scope of a court's discretion to consider a suppression motion on the merits after jeopardy has attached is limited by this factor. *See United States v. Barletta,* 644 F.2d 50, 54–55, 59 (1st Cir.1981) (discussing circumstances under which district court may and may not defer ruling on timely motion until after jeopardy has attached); 1 C. Wright, *Federal Practice and Procedure, Criminal 2d* § 194 at 712 & n. 8 (1982 & Supp. 1985). We hold that the district court did not abuse its discretion when it denied White's motion to suppress as untimely.

■ Although the district court did not hold a full hearing or make clear findings of fact on the question of the voluntariness of the statements, we note that the district court properly exercised its discretion having tentatively concluded that the statements were voluntarily given. This conclusion is supported by the record. The law on this issue is simply stated: to be admissible, a confession must be "free and voluntary ... not obtained by any direct or implied promises, however slight." *Shotwell Manufacturing Company v. United States,* 371 U.S. 341, 347, 83 S.Ct. 448, 453, 9 L.Ed.2d 357 (1963).

The district court was presented with the following facts, as revealed through White's testimony and the transcript of the conversation between White and Chief Assistant State Attorney Norman S. Cannella. Two weeks before White spoke with the police officers, he was told by Cannella that Cannella would recommend that a state court judge set aside White's fifteen-year sentence for a probation violation and would nolle prosequi pending state charges on the kidnapping if information provided by White was of "sufficient degree" to "require" those benefits and if White would agree, generally, to cooperate with certain investigations and, specifically, to testify against his co-defendants in the

state prosecution of the beating and kidnapping.

However, before each conversation with state police officers, White signed a statement that provided in relevant part:

> Any and all statements I make will be freely and voluntarily made. No promises, threats, or inducements of any kind or nature whatsoever have been promised to me in order to consent to this interview.

Moreover, at the taking of his deposition, White was asked about promises made to him, and he replied, under oath, as follows:

> I don't need no immunity. I don't need nothing promised to me and whatever offense that I have committed I'm willing to serve my time and whatever debt to society that I owe.... I feel as a man I should serve it and no promises have been made to me.

These assertions of voluntariness notwithstanding, White testified before the district court that he would not have given the inculpatory statements had Cannella not made the inducements described above. It is not clear whether Cannella did take the actions on White's behalf that he had said he would. For some reason not found in our record, White was not prosecuted on the state charges.

Given this record, we agree that White gave the statements voluntarily. The discussion transcribed in the record indicates that Cannella did not bargain with White to make the particular admissions actually made. Rather he sought information from White "to effectuate arrests, recover narcotics, to discover the burial place of any people that had been murdered, and with more specificity, to testify against some of his co-defendants in a trial that is set in the near future." More significant are White's assertions that his statements were voluntary and that no promises had been given. From these statements the district court could infer that the offer of leniency had been withdrawn prior to the taking of the statements. *See, e.g., United States v. Hooten,* 662 F.2d 628, 631 (9th Cir.1981), *cert. denied,* 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982), or that White would have given the statements even in the absence of any inducement. These considerations support the holding that the district court did not abuse its discretion in refusing to entertain White's untimely motion to suppress.[4]

### C. *Hearsay* (White)

■ Corporal Pricher, a Tampa police officer, spoke with Valerie Endsley just after she was placed in the ambulance after having been removed from Martin's residence. Pricher related the statements he had heard from Endsley to Sergeant Frederick immediately after hearing them. Corporal Pricher died prior to trial, and the district court permitted Frederick to testify about the statements given to Pricher by Endsley over objection from King's attorney on hearsay grounds, finding sufficient trustworthiness to allow the testimony.

Frederick testified that Endsley told Pricher "pretty well what James Thomas had told" the police and that Willie Thomas, King, White and Taylor (a/k/a Phillip Roberts) were responsible for the beating. The government explained to the court that it offered the testimony to explain why James Thomas was not arrested along with the others found at the scene.

White argues on appeal that the district court committed reversible error in admitting this testimony. He appears to assume that it was admitted under the "catch-all"

---

4. White argues that the statements are inadmissible under Fed.R.Crim.P. 11(e)(6), which governs the admissibility of statements made in the course of plea discussions. The negotiations in this case were obviously not undertaken by White in contemplation of a guilty plea and are more accurately characterized as "confession negotiations." The admissibility of inculpatory statements resulting from confession negotia-tions is governed by principles of voluntariness developed under the Fifth Amendment self-incrimination clause and not by Rule 11(e)(6). *See generally United States v. Watson,* 591 F.2d 1058 (5th Cir.), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1070 (1979); *United States v. Robertson,* 582 F.2d 1356 (5th Cir.1978) (en banc). Many of the cases cited by the parties are thus inapposite.

exception set forth in Fed.R.Evid. 803(24), and contends that the evidence did not meet all the criteria for admissibility under Rule 803(24). He maintains, in particular, that it was not necessary because Endsley took the stand and could have been questioned about her conversation with Pricher. Claiming that the information about White's participation in the beating was highly prejudicial, White argues that the court's error requires reversal of his conviction.

We agree with the government that the testimony was not offered for the truth of the matter asserted but to explain the police officers' decision not to arrest James Thomas. It therefore was not hearsay, as defined in Fed.R.Evid. 801(c).

If it was hearsay, the district court erred in admitting the testimony under Rule 803(24) without considering the necessity of doing so. *See Elizarraras v. Bank of El Paso,* 631 F.2d 366, 374 n. 24 (5th Cir.1980), (Rule 803(24) exception not applicable where declarant available to testify). By its language, Rule 803(24) applies only to hearsay that is "more probative on the point for which it is offered than other evidence that the proponent can procure through reasonable efforts." As Endsley's testimony on the subject would have been more probative than the second-hand summary offered by Frederick, admission of Frederick's testimony was unnecessary and did not fall under the Rule 803(24) exception.

However, even if erroneous, the admission was not prejudicial and does not require reversal. The substance of the information related to Frederick by Pricher merely corroborated, in general outline, the testimony of other witnesses. James Thomas' testimony was corroborated in significant respects by Endsley's testimony and by White's own statement. White's participation in the beating was similarly brought to the jury's attention through the testimony of James Thomas and Endsley as well as through White's statement. Any error committed in admitting the testimony does not justify reversal of White's conviction.

### D. *Selective Prosecution* (Martin)

Each of the defendants in this case was prosecuted under state law for the same criminal activities leading to this federal prosecution. None was convicted, but all state charges relating to the kidnapping or beating were dismissed or nolle prossed. The defendants moved to dismiss their federal indictments and asked for a hearing on the ground that their "reprosecution" under federal law violated the equal protection clause because others similarly situated are seldom prosecuted by the federal government. Only Martin reasserts the equal protection argument on appeal. This issue is obviously without merit and the district court committed no error in denying the motion to dismiss without a hearing.

### E. *Prosecutorial Misconduct* (Taylor)

■ In his closing argument, the government attorney stated, "If there was a hit man in this case, Jimmy Taylor was a hit man; and who called him? Peter Martin." Taylor moved for mistrial on the basis of this statement and asked for a curative instruction by the court. The district court denied these requests, noting that the comment was reasonable in light of the evidence. Taylor argues on appeal that the government's characterization of him as a hit man was improper and prejudicial. However, we agree with the government that the comment was not improper given the evidence about Taylor's role in the beating and kidnapping.

Taylor was called to the Martin house when the suspicions that Endsley planned to kill Martin began to surface. He arrived with several guns and effectively took charge of the interrogation of Endsley, pistol-whipping her on at least one occasion. He was a central participant in the actual kidnapping and there was evidence he intended to kill Endsley. While the other defendants' presence in the Martin home at the time of Endsley's visit could be ex-

plained by circumstances unrelated to the unfolding crime, Taylor was asked to come to the house in response to the threat believed to be posed by Endsley. It was not unreasonable to characterize Taylor as the hit man ("[i]f there was [one]") in the situation. The government attorney's comment does not suggest that the government had any information not presented to the jury that Taylor had acted as a "hit man" in other situations.

Even if improper, the characterization could not have been prejudicial. The evidence linking Taylor to the kidnapping was overwhelming. Testimony revealed that he and White were the defendants who actually placed Endsley in the camper and transported her across state lines against her will. The government's statement does not warrant reversal of Taylor's conviction.

### F. *Sufficiency* (King, Martin, White)

We have reviewed the record and find no merit in the contention that the evidence was insufficient to support the convictions of King, White and Martin for kidnapping and conspiracy to kidnap. In particular, with regard to the evidence on interstate transportation, we point out that James Thomas testified that Martin received a phone call during which he was informed that White, Taylor and Endsley were near Atlanta, Georgia. King heard Martin repeat what he had heard over the phone. White's statement also revealed that he had taken Endsley to a hotel near Atlanta, Georgia. Thus there was evidence that White had transported Endsley across state lines and that Martin and King knew it. The evidence was sufficient to show that White, Martin and King conspired to kidnap and in fact kidnapped Valerie Endsley because they believed she planned to kill Peter Martin. These defendants' other various contentions with regard to sufficiency of the evidence are unquestionably without merit.

For the foregoing reasons, the convictions of Elizabeth King, Peter Martin, Sr., Gerald White and Jimmy Edward Taylor for kidnapping and conspiracy to kidnap are AFFIRMED.