**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Vincenzo "Jimmy" AQUAFREDDA, Vito Signorile, Gerald Devivo Suncoast Disposal, Inc., Carlo Dinardi, Donald Fowler, Bernard Agostino Imperial Carting Associates, Inc., Defendants-Appellants.**

**No. 86–3747.**

United States Court of Appeals,
Eleventh Circuit.

Dec. 21, 1987.

---

William P. Murphy, Tampa, Fla., for Aquafredda.

Larry C. Hoffman, Thomas J. Donnelly, Clearwater, Fla., for Signorile, Devivo, Suncoast, Dinardi, Fowler & Imperial Carting.

R.W. Merkle, U.S. Atty., David H. Runyan, Terry A. Zitek, Asst. U.S. Attys., for U.S.

Robert Fraser, Halliday & Fraser, Tampa, Fla., for Agostino.

Before FAY and HATCHETT, Circuit Judges, and MORGAN, Senior Circuit Judge.

FAY, Circuit Judge:

In this case, which is making its second appearance before this court, appellants challenge the district court's verdict finding them in violation of section one of the Sherman Antitrust Act.[1] Appellants' criminal convictions arose out of price fixing, bid rigging and other restraints of trade in the garbage collection industry of Pinellas County, Florida. Appellants contend: (1) there was insufficient evidence to establish jurisdiction in the trial court under the effect on commerce theory; and (2) the trial court abused its discretion by admitting evidence proving an effect on interstate commerce, but occurring after the conspiracy allegedly ended. We affirm.

## I. BACKGROUND

On appeal, we must consider the evidence in the light most favorable to the

---

1. 15 U.S.C. § 1 reads in pertinent part: "Every contract, combination ... or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal."

verdict, and draw all reasonable inferences and decide credibility choices in favor of the jury's decision. *United States v. Lentz,* 624 F.2d 1280, 1285 (5th Cir.1980),[2] *cert. denied,* 450 U.S. 995, 101 S.Ct. 1696, 68 L.Ed.2d 194 (1981). In so doing, we find that the evidence admitted at trial established the following.

In the fall of 1978, several Pinellas County garbage collectors began meeting regularly to discuss price competition from other garbage collectors, and to consider developing remedial procedures when one garbage collector takes another's customers. Representatives of at least eight companies attended these meetings including Mr. and Mrs. Kenny Faircloth, Donald Fowler (Imperial Carting Associates), Vincenzo "Jimmy" Acquafredda (Gulfcoast Sanitation), Vito Signorile (Eagle), Gerald De Vivo (Suncoast Disposal), and Carlo DiNardi. The attendees agreed to increase profits by raising the prices of their service.

In July, 1979, the garbage collectors began calling their organization the Westcoast Cartmen's Association ("WCA"). They used the WCA to further the purposes of their conspiracy. At the WCA meetings defendants agreed: (a) to raise, fix and/or stabilize the prices of solid waste disposal service in their area; (b) to stop providing free service to customers; (c) to require an acquiring WCA member to compensate a losing WCA member for any customer that changed service from one member to another; (d) to rig bids on public and private garbage collection contracts; (e) to allocate customers in the garbage collection business; and (f) to employ threats and acts of violence and intimidation to achieve their purposes. From July, 1979 through April, 1980, the WCA met at least fourteen times.

In December, 1980, the WCA was involuntarily dissolved as a corporation. One year later, the WCA bank account was closed. In July, 1981, some of the conspirators began an association known as Suncoast Haulers, Inc., which attempted to convince Pinellas County to award franchises to members of the solid waste disposal industries.

Throughout the period of the conspiracy, the defendants purchased substantial amounts of trucks, parts, and equipment from out of state suppliers. Some of the defendants received payments from customers whose funds were drawn on the United States Treasury. Others received payments from customers whose funds were drawn on out of state banks and paid from out of state locations.

After a thorough F.B.I. investigation, the government initiated criminal proceedings against the members of the WCA. On March 8, 1984, a grand jury in the Middle District of Florida returned an indictment charging eleven individuals and three corporations with conspiring to restrain trade in the private residential and commercial garbage collection business in Pinellas County, Florida, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. On April 18, 1984, the grand jury returned a superseding indictment charging the same persons with the same offense.

The first jury trial of this case began on June 4, 1984. During this trial, the court permitted the government to introduce the statement given by Defendant Carlo DiNardi to Deputy Fowler of the Pinellas County Sheriff's Office on June 22, 1983. On June 18, 1984, the jury returned guilty verdicts against eight individual defendants and two corporate defendants: Joseph "Jo-Jo" Fitapelli, Vincenzo "Jimmy" Acquafredda, Bernard Agostino, Vito Signorile, Gerald De Vivo, Carlo DiNardi, Donald Fowler, Thomas Kerrigan, Suncoast Disposal, Inc. and Imperial Carting Associates, Inc. At the same time, the jury acquitted three individual defendants and one corporate defendant. All of the convicted defendants appealed. On April 21, 1986, this Court reversed these convictions and remanded for a new trial. *United States v. Fitapelli,* 786 F.2d 1461 (11th Cir.1986).

On August 11, 1986, the second trial began under the same superseding indict-

---

**2.** The Eleventh Circuit in *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

ment. In this trial the court excluded Di-Nardi's statement on the basis that it prejudicially identified the WCA members. The trial court found that admitting this statement would deny WCA members their right of confrontation. On September 2, 1986, the jury convicted the eight individuals and two corporations. All defendants except Joseph Fitapelli and Thomas Kerrigan appeal their convictions for the second time.

## II. DISCUSSION

### A. Jurisdiction

■ Defendants contend that there was insufficient evidence concerning interstate commerce to sustain a finding of jurisdiction under the Sherman Antitrust Act. To obtain jurisdiction under the Act, there must be a showing of a substantial effect on interstate commerce. *See McLain v. Real Estate Board,* 444 U.S. 232, 241, 100 S.Ct. 502, 508, 62 L.Ed.2d 441 (1980).

■ When defendants first appealed this case, this Court found that the government did not prove jurisdiction under the (uncharged) "flow" theory.[3] Instead, we held that the government's evidence was sufficient to establish jurisdiction under the "effect" theory.[4] *Fitapelli,* 786 F.2d at 1464–65. In reviewing the evidence presented at the first trial, this Court observed:

> The record is replete with evidence that shows that the defendants purchased trucks, materials and supplies from out of state which were worth hundreds of thousands of dollars, that checks were drawn on out of state banks and mailed across state lines by out of state corporations, and that at least one of the customers directly engaged in interstate commerce. As a matter of practical economics, a substantial relationship with interstate markets has been established and, therefore, jurisdiction has been proven under the effect theory.

*Id.* Since the parties presented substantially the same evidence during the second trial, our decision in *Fitapelli* forecloses further discussion of the matter.[5]

### B. Conspiracy

Defendants contend that the government alleged in the indictment that a conspiracy existed between September, 1978 and June 31, [sic] 1983, but only proved the existence of a conspiracy until April 25, 1980. They allege that by excluding DiNardi's statement in the second trial, the district court effectively excluded all evidence that a conspiracy existed after April 25, 1980. The effect on commerce component, by contrast, spread from September, 1978 until June 30, 1983. Defendants claim that the district court abused its discretion by admitting into evidence testimony and documents which established that the defendants' business activities after April 25, 1980 affected interstate commerce.

■ Excluding DiNardi's statement does not foreclose the existence of a conspiracy after April, 1980. Implicit in defendants'

---

**3.** Under the "flow theory" the jurisdictional requirement may be met by introducing evidence that the defendant's challenged activity: 1) involved a substantial volume of interstate activity, and 2) was an essential part of the transaction and inseparable from its interstate aspects. *McLain,* 444 U.S. at 244, 100 S.Ct. at 510; *United States v. Fischbach and Moore, Inc.,* 750 F.2d 1183, 1192 (3d Cir.1984), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985).

**4.** The "effect on commerce" theory applies to activities that, while wholly local in nature, substantially affect interstate commerce. *Construction Aggregate Transport, Inc. v. Florida Rock Indus.,* 710 F.2d 752, 767 (11th Cir.1983); *Furlong v. Long Island College Hosp.,* 710 F.2d 922, 925 (2d Cir.1983). This theory has been broken down into two components: 1) a substantial amount of interstate commerce is involved, and 2) the challenged activity has a "not insubstantial effect" on interstate commerce. *Fischbach and Moore,* 750 F.2d at 1192; *see McLain,* 444 U.S. at 245–46, 100 S.Ct. at 510–11.

**5.** The earlier reversal was required because the trial court had charged the jury on both the flow theory and the effect on commerce theory. The government did not allege the flow theory in the indictment. *See supra* note 3. By charging on the (uncharged) flow theory, "the trial court materially amended the indictment and destroyed the defendants' right to be tried only on the charges against them." *Fitapelli,* 786 F.2d at 1463–64.

argument is the assumption that proof of the interstate commerce element must be co-extensive with proof of the duration of the conspiracy. While reported cases do not discuss this issue, it is clear that the effect on interstate commerce can outlast the conspiracy. *United States v. Coia,* 719 F.2d 1120, 1124 (11th Cir.1983) (When a conspiracy does not require an overt act, it "may be deemed to continue as long as its purposes have neither been abandoned nor accomplished."), *cert. denied,* 466 U.S. 973, 104 S.Ct. 2349, 80 L.Ed.2d 822 (1984); *United States v. Etheridge,* 424 F.2d 951, 964 (6th Cir.1970) ("A conspiracy, especially one which contemplates a continuity of purpose and a continued performance of acts, is presumed to continue until there has been an affirmative showing that it has been terminated."), *cert. denied,* 400 U.S. 991, 993, 1000, 91 S.Ct. 462, 27 L.Ed.2d 437 (1971); *Poliafico v. United States,* 237 F.2d 97, 106 (6th Cir.1956) ("[A] conspiracy once established, is presumed to continue until the contrary is established."), *cert. denied,* 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed. 2d 597 (1957). A careful review of the record reveals that the defendants' conspiratorial agreement contemplated their continued cooperation. The agreement to fix prices and allocate territories was of indefinite duration. After the government presented evidence proving a conspiracy, defendants presented no evidence that any of the conspirators believed their goals had been accomplished, or that any defendant had formally withdrawn. Moreover, there was no persuasive evidence that any defendant had abandoned the conspiracy.

■ Defendants next argue that the closing of the WCA bank account in December, 1981, and the involuntary dissolution of the association in December, 1980 both support the inference that the WCA and its activities, conspiratorial and otherwise, concluded before that date. In many cases it is difficult to prove the precise beginning or end of a conspiracy. Ample authority allows the trial court broad discretion to determine that a conspiracy ter-

minated after the defendant said it ended. *See, e.g., United States v. Varella,* 692 F.2d 1352, 1362 (11th Cir.1982), *cert. denied,* 464 U.S. 838, 104 S.Ct. 127, 78 L.Ed. 2d 124 (1983) ("The duration and termination of a conspiracy is determined by the particular facts of each case."). The evidence shows that between August, 1979 and June, 1983, the defendants' businesses generated substantial income from activities affecting interstate commerce. The conspirators continued to operate their garbage collection businesses into 1983. After April, 1980 they continued to associate with one another socially and professionally through a new association known as Suncoast Haulers, Inc. Based on this, the jury was entitled to infer that the conspiracy continued.

■ Finally, defendants assert that excluding from evidence those transactions occurring after April 25, 1980 might have caused the grand jury to find that there was no effect on interstate commerce. Notwithstanding its duration, there was clear evidence of a conspiracy substantially affecting interstate commerce. Defendants fail to persuasively state, nor can we discern how admission of the evidence adversely affected any of their substantial rights. They will not be heard to complain when—even if they proved that the conspiracy ended on April 25, 1980—they still would have been convicted. We find that the trial court did not abuse its discretion in admitting evidence of defendants' business activities which affected interstate commerce. AFFIRMED.