**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Louis BROADWELL, a/k/a Drifter, Ulice Melton, a/k/a Cloud Nine, Gene, and Michael Anthony Blanton, Defendants–Appellants.**

No. 87–8567.

United States Court of Appeals,
Eleventh Circuit.

April 19, 1989.

Bruce Maloy, Maloy, Sadow & Jenkins, Atlanta, Ga. (Court-appointed), for Louis Broadwell.

W. Benjamin Ballenger, Summerville, Ga., for Ulice Melton.

John W. Stokes, Lawrenceville, Ga., for Michael Anthony Blanton.

H. Allen Moye, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before HATCHETT and CLARK, Circuit Judges, and HOEVELER *, District Judge.

---

* Honorable William M. Hoeveler, U.S. District Judge for the Southern District of Florida, sitting by designation.

CLARK, Circuit Judge:

This action arises from an alliance of truckers and "bathtub chemists" who collectively engaged in various activities involving the manufacture, sale and distribution of crystal methamphetamine ("crystal").[1] Appellants Louis Broadwell, Michael Blanton, and Ulice Melton appeal from their convictions on various drug, kidnapping and firearms charges.[2]

## I. Background
### A. The Conspiracy Begins

The facts in this action revolve around a coterie of drug traffickers including some would-be chemists and their portable laboratory. In 1985, a small group of individuals met and entered an agreement to manufacture crystal in San Bernardino County, California. This group consisted of William Brittain, Lynda Placko, and Larry Query. Melton was also a part of this group. He provided some of the start-up investment capital and actively managed the group's search for a manufacturing location and source of supplies outside of California.

### B. Broadwell Enters the Conspiracy

The group continued their crystal manufacturing and distribution operations throughout the fall and winter of 1985–1986. During this time, Melton introduced Broadwell into the conspiracy. Broadwell operated a small trucking business out of Charleston, South Carolina which often made cross-country runs. Because of Broadwell's trucking background, he was familiar with crystal and its use by truckers to increase alertness and ward off drowsiness. As his first delivery for the group, Broadwell received six ounces of crystal in Palm Springs, California during Christmas and returned to South Carolina where it was later sold.

During February and March 1986, Melton told Brittain and Placko that he had found a suitable location on the East Coast to manufacture crystal. Melton then made arrangements to move the laboratory equipment to Birmingham, Alabama where Placko obtained it and delivered it to Broadwell's home in Summerville, South Carolina. Placko, Brittain and Melton met and began manufacturing crystal. The finished product was divided among themselves for distribution. Some was also distributed to Michael Wilkin, who would become the group's major wholesaler.

In early April, 1986, Melton and Placko met at Melton's home in Georgia, set up the crystallization process there, and produced some crystal from methamphetamine oil. On April 5, Melton received some crystal and delivered a portion of it to Wilkin. Melton also paid $5000 to Placko.

On April 10, Melton delivered the remaining methamphetamine oil and money to Brittain. He then returned to Broadwell's South Carolina home to set up the laboratory there. During April and May, Melton also manufactured crystal in Anderson, South Carolina and Greenville, South Carolina. The crystal was delivered to Wilkin for distribution and sale.

Wilkin and Melton met again, this time on an interstate highway in Georgia in early June, 1986, where Melton delivered more crystal to Wilkin. Wilkin soon met with James Phillips, who having purchased crystal from Melton through an intermediary, wanted to become a crystal distributor. Phillips was to become a primary crystal retailer.

Later that summer, Brittain, Placko, Query, and Broadwell met to reassign their duties when Melton decided to stop dealing with the group. Broadwell was to undertake Melton's manufacturing role but not participate in crystal distribution. Query was in charge of purchasing supplies. The laboratory was also moved again, this time to another location in either North or South Carolina where approximately two pounds

---

1. Crystal methamphetamine is a Schedule II controlled substance.

2. Steve Blanton is appellant Michael Blanton's brother. Both Blanton brothers were charged in the government's indictment with conspiracy to manufacture, sell and possess crystal. This opinion refers to Michael Blanton as "Blanton."

of crystal were produced. This batch was distributed to Query, Broadwell, and Wilkin (who received about one pound). Wilkin subdivided his pound and delivered part to Phillips in Georgia. Query distributed additional quantities of crystal to Wilkin who forwarded it on to Phillips [3] on two occasions and once to John Bauer.

In early October, 1986, Brittain and Placko agreed with George Livingston to provide Livingston with crystal for distribution by yet another distributor in Georgia, Rodney Fairbanks. Broadwell manufactured another batch of crystal from which a sample was sent to Livingston for Fairbanks's approval. During this time, Brittain and Placko traveled from California to South Carolina by way of Georgia. They picked up the laboratory and necessary chemicals and went to Cross, South Carolina where they manufactured about two pounds of crystal. These two pounds were delivered to Fairbanks in Atlanta, Georgia.

### C. Things Fall Apart—Lab on the Run

Through misadventure, Fairbanks sold one pound of crystal to an Atlanta undercover officer. Following his arrest, Fairbanks furnished information leading to the arrest of Brittain, Placko and Livingston who had arrived in Atlanta and checked into a hotel shortly before the bust. The arresting officers found the remaining crystal from the last batch and a pound of the chemical inputs in the hotel room. Brittain also had a handgun in his possession that was registered to Broadwell.

The arrests sent shock waves through the conspirators who immediately launched a cooperative effort to raise money to free Brittain and Placko. Their first step was to pick up the crystal laboratory in South Carolina. Broadwell called ahead to Livingston's home to arrange for Query and James Bowers to obtain and then deliver

the equipment to Broadwell's home on November 2. Phillips and Wilkin, at Broadwell's direction, drove from Georgia to Broadwell's home, picked up the lab, and moved it to Birmingham, Alabama.

Broadwell, who was in California, then decided that the entire crystal operation should be moved to Illinois where Bauer lived. This move required Phillips to drive Brittain's automobile loaded with chemicals from California to Houston, Texas where Broadwell, Belinda Swing,[4] and Phillips met him. Phillips returned to Atlanta but the remaining three drove to Bauer's home in Greenfield, Illinois. They set up the laboratory and Broadwell began manufacturing crystal but soon ran into production difficulties. Undaunted, a three-way call between Broadwell, Placko and Brittain (who was in the Fulton County jail) provided the needed advise and assistance to produce the batch.

The laboratory was moved to various Illinois locations, then to Wilkin's Indianapolis home, and finally south to Pigeon Forge, Tennessee. Wilkin and Bauer then drove to Pigeon Forge and checked into a motel. Phillips and Michael Blanton also joined them in Pigeon Forge. When there was no response to their knocks on the motel room door, they asked the motel personnel to open it. Once inside, the motel personnel discovered a loaded semiautomatic pistol and some marijuana, but neither Wilkin nor Bauer were present. Suspicions aroused, the motel personnel called the police who arrested Bauer and Bowers upon their return. Wilkin, however, became wary and did not return to the motel. Phillips and Michael Blanton also fled the area.[5]

In December, Broadwell and Phillips drove from Georgia to Alabama to meet Query who had brought chemicals for the laboratory from California. These chemicals were later transported to the laboratory in Tennessee.

---

3. Phillips' wife, Kathy, assisted by cutting, bagging, distributing and receiving payments for these deliveries of crystal.

4. Swing was Broadwell's girlfriend and had participated in various aspects of the conspiracy to manufacture crystal.

5. Phillips and Michael Blanton, however, arranged for bond to be posted for Bauer and Bowers.

### D. The Kidnapping

Broadwell and Phillips returned to Atlanta in possession of about 280 grams of crystal. On December 18, Broadwell and Wilkin drove to Knoxville, Tennessee with the purpose of selling the crystal. A day later Wilkin absconded with the crystal and went into hiding. With his wife's help he flew to Atlanta where he met Jimmy Wright. The two then met David Dunlap to whom Wilkin delivered the 280 grams of crystal.

Needless to say, Broadwell and Phillips began looking for Wilkin. During the early morning hours of December 31, Phillips and David Florence ("Big D") located Wilkin at Wright's home in Clayton County, Georgia. Big D severely beat Wilkin and when Broadwell and Michael Blanton arrived, Broadwell joined in the beating. Broadwell and others were armed at this time and made a futile search of Wright's apartment for the crystal.

After Wilkin disclosed that Dunlap had the crystal, Broadwell, Phillips and Big D took Wilkin to Dunlap's home in Alabama where they recovered the crystal. They returned immediately to Phillips' home in Georgia where they continued to forcibly restrain Wilkin. According to Wilkin, they wanted to prevent Wilkin from cooperating with the authorities and possibly testifying in the trial in Pigeon Forge, Tennessee. Wilkin stated that Michael Blanton, along with a number of other individuals were at Phillips' home when Wilkin arrived.[6] Wilkin also testified that Broadwell and Phillips told him that if he tried to escape, they would kill him or any member in his family. Record, Vol. 9 at 775–76.

Wilkin was held from December 31 to January 23 while being moved to various locations. Russell Barrett[7] agreed to "keep an eye" on Wilkin in return for two ounces of crystal Phillips provided. Barrett held Wilkin in an Atlanta apartment until January 2 when he was moved to Barrett's house for a few hours. He was then moved to a lake house near Lake Lanier where Barrett held him for three or four days. Wilkin was then moved back to Barrett's house in Atlanta for a ten day period. During this time Phillips told Barrett not to worry too much about Wilkin because Wilkin would never make it home alive.

Steve Blanton picked up Wilkin who was still in Barrett's custody and drove them to Alabama. Phillips stated that Barrett should bring Wilkin to Alabama so that Phillips could "take care of" Wilkin. The next day, Steve Blanton and Barrett again transported Wilkin to Alabama where he was held in a rented cabin for three days.[8] On January 21st, Wilkin was returned to Phillips' house in Georgia.

### E. The End

Wilkin's saga of captivity ended on January 23rd when the Federal Bureau of Investigation S.W.A.T. team, acting on information received from Mrs. Wilkin, recovered and arrested Wilkin at Phillips' house. Michael Blanton was also arrested at the house. Later that day, Broadwell, Phillips, Swing, and Bauer were arrested at a Holiday Inn in Jonesboro, Georgia.

The government's second superseding indictment charged the defendants with conspiracy to manufacture and distribute crystal. In separate counts, the indictment charged twenty overt acts committed in furtherance of the conspiracy including Wilkin's kidnapping. The defendants at trial were Broadwell, Michael Blanton, Steve Blanton, Melton, Mr. & Mrs. Phillips, and Swing. The Phillips and Steve Blanton pled guilty to some of the charges during trial.

---

**6.** Included in this group were Steve Blanton, Kathy and David Phillips, Barrett, Brent Bevins and his wife, Big D and his wife and a woman named Marie Rogers. Record, Vol. 9 at 764, 775. Wilkin stated that the Phillips and the Blanton brothers "all had guns all the time." *Id.* at 775.

**7.** Barrett's connection to the conspirators is that he apparently had purchased crystal from both Phillips and his wife and Michael Blanton in the past.

**8.** During this period, Michael Blanton gave Phillips 13 grams of crystal he had taped in the bottom of his suitcase. Phillips sold the crystal and gave Blanton $900; Blanton wired $200 of this sum to his wife from Montgomery, Alabama on January 20th.

Following a jury trial, Broadwell, Michael Blanton and Melton were convicted of conspiracy to manufacture, distribute, and possess with intent to distribute, crystal under 21 U.S.C. §§ 841(a)(1) & 846.[9] Melton was convicted on two other counts of possession with intent to distribute crystal. Broadwell was convicted on three other § 841(a)(1) counts and four counts involving interstate travel or the use of an interstate facility (telephone)[10] in furtherance of the § 841(a)(1) counts.[11] In addition, Michael Blanton was convicted on one count involving interstate travel in furtherance of the conspiracy. Finally, Broadwell and Michael Blanton were convicted of kidnapping a co-conspirator in violation of 18 U.S.C. § 1201(a) and (c).[12] Broadwell was also convicted for using a firearm in the co-conspirator's kidnapping.[13] Broadwell, Melton and Blanton appeal these convictions.[14]

## II. Issues and Analysis

### A. Broadwell

Broadwell does not contest his drug convictions. He does, however, contest the kidnapping and the firearm possession charges. Broadwell raises two issues on appeal: (1) whether there is sufficient evidence to support the kidnapping and firearms convictions and (2) whether the trial court erred in its *Pinkerton* instruction.

■ At the outset, we reject the government's position that Broadwell's conviction must stand simply because there was sufficient evidence for a jury to convict him on the kidnapping charges. Broadwell's convictions could have been based on one of two theories: direct involvement in the offenses or vicarious *Pinkerton* liability. The general rule is that "a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." *Zant v. Stephens,* 462 U.S. 862, 881, 103 S.Ct. 2733, 2745, 77 L.Ed.2d 235 (1983); *Tafero v. Wainwright,* 796 F.2d 1314, 1319 (11th Cir.1986), *cert. denied sub. nom., Tafero v. Dugger,* — U.S. —, 107 S.Ct. 3277, 97 L.Ed.2d 782 (1987); *Hitch-*

**9.** 21 U.S.C.A. § 841(a)(1) (1981) provides, in pertinent part, that "it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

21 U.S.C.A. § 846 (1981) provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

**10.** 18 U.S.C.A. § 1952(a)(3) (1982) provides that "[w]hoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to otherwise promote, manage, establish, carry on, or facilitate the production, management, establishment, or carrying on, of an unlawful activity, and thereafter performs or attempts to perform any [specified acts], shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

**11.** Broadwell was convicted on two counts as a principal and two as an aider or abettor. 18 U.S.C.A. § 2 (1982).

**12.** 18 U.S.C.A. § 1201(a) & (c) (1982) provide, in pertinent part, that:

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when: (1) the person is willfully transported in interstate or foreign commerce ... shall be punished by inprisonment for any term of years or for life.

. . . . .

(c) If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life.

**13.** 18 U.S.C.A. § 924(c) (1982) provides that "Whoever (1) uses a firearm to commit any felony which may be prosecuted in a court of the United States, or (2) carries a firearm unlawfully during the commission of any felony which may be prosecuted in a court of the United States, shall be sentenced to a term of imprisonment for not less than one nor more than 10 years."

**14.** Broadwell received a forty year sentence, Blanton received twelve years and Melton received twenty years followed by five years probation.

*cock v. Wainwright,* 745 F.2d 1332, 1340 (11th Cir.1984), *rev'd on other grounds, Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). Because Broadwell's conviction could be based on either the properly-instructed kidnapping charges and firearm charges or the allegedly erroneous *Pinkerton* instruction, we are uncertain as to the actual basis for the jury's decision. Thus, we must make two mutually exclusive inquiries: whether the evidence, independent of co-conspirator's actions, is sufficient to support the charges and whether the *Pinkerton* instruction, if erroneous, constituted prejudicial error.

### 1. Sufficiency of the Evidence

Broadwell argues that there is insufficient evidence to sustain his conviction on the kidnapping and firearm charges. He asserts that Wilkin had the motivation to fabricate his own kidnapping and played the role of a kidnapping victim to create a bargaining chip with the government. Broadwell states that because it is only Wilkin's testimony that makes him a kidnapping victim (rather than merely another co-conspirator), this evidence is insufficient for the jury to have found that anyone kidnapped Wilkin.

■ Broadwell's argument is misplaced. Testimony of a co-conspirator, even if uncorroborated, is sufficient to support a conviction. *United States v. Trevino,* 565 F.2d 1317, 1319 (5th Cir.1978), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1613, 56 L.Ed.2d 63 (1978).[15] As the government points out, Broadwell is attacking the credibility of Wilkin's testimony. We must, however, consider the evidence in the light most favorable to the verdict, and decide credibility choices in favor of the jury's decision.

*United States v. Aquafredda,* 834 F.2d 915, 916–17 (11th Cir.1987), *cert. denied sub nom., Agostino v. United States,* —— U.S. ——, 108 S.Ct. 1278, 99 L.Ed.2d 489 (1988).

■ The evidence demonstrates that Broadwell either participated in Wilkin's actual detention or knew that other members of the conspiracy were unlawfully restraining him in an attempt to locate the stolen crystal. The evidence establishes that Broadwell and others were in pursuit of Wilkin. Phillips and "Big D" had already beaten and detained Wilkin in Atlanta upon the arrival of Broadwell and Michael Blanton. Broadwell beat Wilkin and ransacked Wright's home in search of the missing crystal. Broadwell, Phillips and "Big D" then transported Wilkin across state lines to Dunlap's house in Alabama where they found the crystal.[16] Broadwell later took credit for Wilkin's plight stating "We got [Wilkin]. We got him good." Record, Vol. 14 at 1635. Wilkin also stated that Broadwell and Michael Blanton both threatened they would harm him or his family if he tried to escape. Record, Vol. 9 at 778.

We find that this evidence is sufficient for a jury to have concluded that Broadwell was an active participant in Wilkin's kidnapping despite Broadwell's later statement to the contrary.[17] The unlawful restraint of Wilkin began on December 31, 1986 and continued through January 23, 1987. Broadwell played a significant role in the early stages of the detention and cannot later close his eyes to Wilkin's subsequent predicament at the hands of other co-conspirators. We therefore find sufficient evidence to establish that Broadwell was actively involved in Wilkin's detention

---

**15.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (in banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

**16.** As the government points out, the crime of kidnapping was complete at this point regardless of what occurred later. *See United States v. Hall,* 587 F.2d 177, 181 (5th Cir.1979) (interstate transportation of unassenting person who was

held for ransom or reward), *cert. denied sub nom., Dyar v. United States,* 441 U.S. 961, 99 S.Ct. 2405, 60 L.Ed.2d 1065 (1979).

**17.** Barrett testified that at a gathering of conspirators at Phillips' house Broadwell hollered out loudly that Wilkin was "free to walk at any time." The district court had instructed the jury that they were authorized to consider this false exculpatory statement to be evidence of Broadwell's consciousness of guilt. *See United States v. Barresi,* 601 F.2d 193, 194–95 (5th Cir.1979).

and later had knowledge that other co-conspirator's continued Wilkin's detention.

Consequently, we conclude that the jury's guilty verdict on the kidnapping and firearm charges is supportable. One alternative basis for criminal liability, therefore, is met.

### 2. *Pinkerton* Instruction

Broadwell also argues the district court's *Pinkerton* [18] instruction constitutes prejudicial error requiring reversal. The district court read the following *Pinkerton* instruction to the jury:

> [Y]ou are instructed that a defendant may be found guilty of conspiring with intent to distribute methamphetamines even if the defendant did not join the conspiracy until after its inception, and even if the defendant played only a minor role in the whole scheme.
>
> Now, further, you are instructed that once the government has proved beyond a reasonable doubt that the conspiracy existed that a defendant knowingly became a member of the conspiracy then that defendant is bound by all acts of other co-conspirators that occurred during the conspiracy, even if those acts were unknown to the defendant.

Record, Vol. 15 at 1940. Broadwell and Michael Blanton objected to the instruction because it failed to include the "in furtherance of" portion of a *Pinkerton* charge.[19] The district court brought the jury back into the courtroom and clarified the instruction:

Ladies and Gentlemen, in the event I misspoke in a couple of instances, I want to correct and make sure that you understand two principles that I instructed you on. . . .

[I]n instructing you concerning the issues of conspiracy, I instructed you that once the Government has proved—in this fashion, and I want to again instruct you in case there was any confusion in regard to it. Once the Government has proved beyond a reasonable doubt that a conspiracy existed and that a defendant knowingly became a member of the conspiracy, then the defendant is bound by all acts of other co-conspirators that occurred during the conspiracy *and were in furtherance of the conspiracy* even if those acts were unknown to the defendant.

What that instruction could convey is the only way any statements of other persons may be considered against a third person, any acts or statements, would be is if they are made during the course of the conspiracy and are made in pursuance or furtherance of the conspiracy.

Now, with those two matters being given to you to make sure they are clear, I suggest to you and instruct you that you should not consider those out of context but consider them along with everything else that I have given you.

Record, Vol. 15 at 1960–62. After the curative instructions, Broadwell renewed his general objection.[20]

---

**18.** In *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), the Supreme Court held that each member of a conspiracy is criminally liable for all *reasonably foreseeable crimes* committed during the course and in furtherance of the conspiracy.

**19.** The district court's jury instructions on the co-conspirator hearsay exception included the "in furtherance of" language:

> Now, whenever it appears beyond a reasonable doubt from the evidence in the case that a conspiracy existed and that a defendant was one of the members of that conspiracy, then the statements thereafter knowingly made and the acts thereafter knowingly done by any person likewise found to be a member may be considered by the jury as evidence in the case as to the defendant found to have

been a member even though the statements and acts may have occurred in the absence and without the knowledge of the defendant, provided such statements and acts were knowingly made and done during the continuance of such conspiracy *and in furtherance of some object or purpose of the conspiracy.* Record, Vol. 15, at 1936–40. This instruction, however, relates to whether the jury may consider co-conspirators' statements and acts within the scope of the conspiracy as evidence against other co-conspirators. It does not directly relate to the *Pinkerton* liability issue.

**20.** Broadwell did not specifically object based on the district court's failure to include the "reasonably foreseeable" language. He simply renewed his earlier objection. Record, Vol. 15 at 1963.

On appeal, Broadwell urges that the *Pinkerton* instruction is erroneous because it fails to establish that a co-conspirator is accountable for other co-conspirators' acts that are in furtherance of the conspiracy *and* are reasonably foreseeable.[21] Broadwell claims that this erroneous instruction permitted the jury to convict him on the kidnapping charge even though, he asserts, he did not participate in the actual kidnapping of Wilkin nor was the kidnapping a reasonably foreseeable event arising out of the drug conspiracy.

The government argues that the district court's jury instructions (including the curative instructions) when read in their entirety were proper.[22] The government further urges that the district court's failure to instruct on the "reasonably foreseeable" prong is not prejudicial to Broadwell because there was sufficient evidence to establish that Broadwell remained in the conspiracy with knowledge that a kidnapping *in furtherance* of the objectives of the conspiracy had occurred. In this case, the government argues that whether the kidnapping was reasonably foreseeable or not is irrelevant. Broadwell, either having participated in or knowing that his co-conspirators had participated in Wilkin's restraint, cannot complain about his convictions because they result from actions in furtherance of the conspiracy.

■ Our analysis begins with the proper *Pinkerton* charge. There is no question that the trial court failed to instruct the jury that vicarious liability under *Pinkerton* extends only to those acts of co-conspirators which are in furtherance of the conspiracy and reasonably foreseeable. *Pinkerton*, 328 U.S. at 648, 66 S.Ct. at

1184; *United States v. Alvarez*, 755 F.2d 830, 847 (11th Cir.1985), *cert. denied sub nom., Hernandez v. United States*, 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1986); *United States v. Moreno*, 588 F.2d 490, 493 (5th Cir.1979), *cert. denied*, 441 U.S. 936, 99 S.Ct.2061, 60 L.Ed.2d 666 (1979). Failure to include the "reasonably foreseeable" language extends vicarious liability for co-conspirators' acts which may have furthered the conspiracy's objectives but were outside the range of actions originally intended or envisioned. Reversal of Broadwell's conviction, however, is unwarranted if the erroneous instruction is harmless beyond a reasonable doubt. Our inquiry, therefore, must necessarily focus on whether Wilkin's kidnapping was reasonably foreseeable.[23]

The typical *Pinkerton* case falls into one of two categories: (1) where the substantive crime is one of the primary goals of the conspiracy; or (2) where the substantive crime is not a primary goal of the conspiracy but directly facilitates the achievement of one of the primary goals. *United States v. Alvarez, supra.* Wilkin's kidnapping does not fall squarely into either of these categories. In *Alvarez*, however, we extended the *Pinkerton* doctrine to cases involving substantive crimes which are reasonably foreseeable but originally unintended. The appellants in *Alvarez* were convicted under the *Pinkerton* doctrine on murder charges arising from an abortive undercover operation in which one government agent was killed.[24] The court stressed that this extension of criminal liability is narrowly drawn to apply only to "conspirators who played more than a 'minor role' in the conspiracy, or who had

---

**21.** Melton and Michael Blanton make similar objections which we analyze *infra*.

**22.** The government points us to *United States v. Mills*, 704 F.2d 1553 (11th Cir.1983), *cert. denied*, 467 U.S. 1243, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984), in which the Court held that a *Pinkerton* instruction which failed to include the "reasonable foreseeability" language was proper. The Court, however, addressed only whether a *Pinkerton* instruction was permissible in the particular case, not whether the instruction itself was correct. *Id.* at 1565–66. Thus, *Mills* does not assist our analysis.

**23.** The evidence is sufficient to establish the other prerequisites for *Pinkerton* liability (1) that a conspiracy existed; (2) that Broadwell had knowledge of the conspiracy; and (3) voluntarily became a part of it. *United States v. Clark*, 732 F.2d 1536, 1539 (11th Cir.1984). The evidence is also sufficient to establish that Wilkin's abduction was in furtherance of the objectives of the conspiracy.

**24.** 755 F.2d at 839.

actual knowledge of at least some of the circumstances and events culminating in the reasonably foreseeable but originally unintended substantive crime." 755 F.2d at 851 n. 27.

This case is similar to *Alvarez* in a number of ways. First, both involved drug conspiracies in which conspirators committed crimes of violence in furtherance of the conspiracy. Second, the appellants in both cases argued that the substantive crime was not a reasonably foreseeable consequence of the drug conspiracies. Third, like the appellants in *Alvarez*, Broadwell played more than a "minor role" in the conspiracy.[25] In addition, Broadwell had actual knowledge of the circumstances and events leading to the originally unintended kidnapping of Wilkin. Fourth, the conspirators in both cases participated in extremely dangerous illegal activities involving the volatile mix of large sums of money and the possession of firearms.[26]

Finally, we recognize that the foreseeability of Wilkin's kidnapping varies depending upon which stage of the conspiracy we consider. During the conspiracy's early days, the foreseeability that a co-conspirator would be beaten and kidnapped in order to effectuate the return of stolen drugs may have been minimal. Following Wilkin's flight with the stolen crystal in December 1986, however, the foreseeability of some retaliatory action became almost a certainty. Given the state of the crumbling drug conspiracy in late 1986, it became reasonably foreseeable that the unlawful restraint of a co-conspirator might occur. Our conclusion is buttressed by evidence that demonstrates Broadwell and others had actual knowledge of or participated in the circumstances and events leading to the originally unintended kidnapping of Wilkin. For these reasons, we find that the district court's failure to include the "reasonably foreseeable" language in the

*Pinkerton* instruction does not constitute prejudicial error.

We note that this Court has undertaken a similar inquiry in other contexts. For instance, in *United States v. Meester*, 762 F.2d 867, 878 n. 9 (11th Cir.1985), *cert. denied sub nom.*, 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985), a defendant did not object to the trial court's failure to include the reasonably foreseeable language in its *Pinkerton* charge. On appeal, this Court held that there was no prejudicial error because the overt act for which the defendant was convicted (transporting money in excess of $5000 beyond a United States border in violation of currency law) was a reasonably foreseeable consequence of the established drug conspiracy. 762 F.2d at 878 n. 9. Similarly, the forcible detention of individuals in furtherance of the goals of a drug conspiracy is not unprecedented. For example, in *United States v. Robinson*, 635 F.2d 363 (5th Cir. Unit B 1981), *cert. denied*, 452 U.S. 916, 101 S.Ct. 3050, 69 L.Ed.2d 419 (1981), a group of conspirators in a rapidly deteriorating marijuana ring kidnapped an individual in an attempt to locate some undelivered marijuana and retrieve their money. *Id.* at 365. The defendants contended that the kidnapping was a second distinct conspiracy that followed the main conspiracy. This Court rejected this argument and held that evidence of the kidnapping was "highly probative" on the existence of the overall conspiracy. *Id.*

In summary, we find that there was both sufficient evidence for the jury to convict Broadwell of the kidnapping and firearms charges and that the erroneous *Pinkerton* instruction did not constitute prejudicial error.

## B. Melton

Melton raises three issues on appeal: (1) whether there is sufficient evidence to sup-

---

**25.** Because Broadwell played a significant role in the conspiracy, we reject his argument that the application of the *Pinkerton* doctrine to him will expand the *Alvarez* decision to conspirators who played only "minor roles."

**26.** As noted in *Alvarez*, "[e]xperience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales, glassine bags, cutting equipment, and other narcotics equipment." 755 F.2d at 849 (citations omitted).

port the drug possession charges in Counts Two and Three of the indictment; (2) whether the district court erred in not granting Melton's motion for a severance of his trial from the other defendant's charges; and (3) whether the trial court erred in its *Pinkerton* instruction.

### 1. Sufficiency of the Evidence

Melton argues that the only evidence that Melton possessed crystal in April and June of 1986 was Wilkin's uncorroborated testimony. Melton's contentions parallel Broadwell's because both attack the credibility of Wilkin's testimony. In contrast, however, Wilkin's testimony regarding Melton's involvement is corroborated by both Placko's and Brittain's testimony and information contained in Placko's ledger. For these reasons and the reasons stated *supra* in our analysis of Broadwell's claims, we conclude that there was sufficient evidence from which a jury could reasonably conclude Melton was guilty on the drug possession charges.

### 2. Severance Motion

Melton argues that the district court's failure to grant his severance motion constitutes error because of the prejudicial effects of spill-over evidence of offenses which occurred after his withdrawal from the conspiracy.[27] The government argues that the district court properly exercised its discretion in joining the defendants and properly instructed the jury on the law of multiple conspiracies and withdrawal. Because the jury found Melton guilty of offenses that arose only before his purported withdrawal from the conspiracy, the government urges that Melton suffered no prejudice.

The granting of a severance motion is within the sound discretion of the trial court and is reviewable only for an abuse of discretion. *United States v. Meester*, 762 F.2d at 883. Melton must

demonstrate "compelling prejudice" arising from the district court's refusal to sever to show an abuse of discretion. *Id.* The district court refused to grant Melton's severance motion for two primary reasons. First, the court stated that the kidnapping charges were clearly separated from the charges against Melton. Second, each of the twenty-one counts were separately identified so the jury could make an independent evaluation of each one. The court also instructed the jury to consider each defendant and each charge separately. Record, Vol. 15, at 1939–40, 1953–54. We find that the court was well within its discretion to try all the co-conspirators together. *Id.* at 883–84.

### 3. *Pinkerton* Instruction

Melton also complains about the erroneous *Pinkerton* instruction. Our review of the record, however, leads us to conclude that the instruction, read in its entirety, does not result in reversible error. Our two-part inquiry, which parallels that *supra*, requires there to be both sufficient evidence to convict Melton of the two offenses independent of the *Pinkerton* charge and non-prejudicial error in the *Pinkerton* instruction. First, we concluded *supra* that the evidence is sufficient to support the two drug possession convictions. Next, we find that the lack of the "reasonably foreseeable" language does not prejudice Melton. It takes little imagination to foresee that a co-conspirator in a drug conspiracy may possess a quantity of the drug in furtherance of the conspiracy. Further, the jury had sufficient evidence to conclude that one of Melton's co-conspirators illegally possessed crystal during Melton's participation in the conspiracy. Thus, Melton's convictions must stand.

### C. Michael Blanton

Michael Blanton raises five issues on appeal: (1) whether the district court erred in

---

**27.** Melton's motion was pursuant to Rule 14, Federal Rule of Criminal Procedure which, in pertinent part, provides:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever relief justice requires.

failing to disqualify and discharge the jury when a juror made a prejudicial remark in the jury's presence; (2) whether the district court erred in failing to grant a mistrial following the government's allegedly intentional injection of prejudicial testimony; (3) whether the district court erred in failing to grant a judgment of acquittal; (4) whether the district court erred in its *Pinkerton* charge; and (5) whether the district court erred in failing to give the jury full instructions on character evidence.

## 1. Juror Disqualification

■ Blanton argues that one juror's response to a question during voir dire made in front of other jurors was highly prejudicial requiring the district court to dismiss the entire jury panel. This error, Blanton asserts, requires reversal of his conviction.

In response to the district court's inquiry whether any prospective juror might be biased against defendants charged in a drug conspiracy, a juror stated "My wife is a speech therapist at a public school in Clayton County. She works primarily with mentally retarded children, many of whom are the result of drug taking during pregnancy." Record, Vol. 6, at 66. The district court undertook various measures in response to this remark to insure no prejudice would result to the defendants. The court asked whether any panel members were influenced by the remark. The court questioned further any jurors who responded affirmatively outside the presence of other jurors. Every prospective juror who indicated influence was removed for cause.

We find that the district court properly exercised its discretion in conducting voir dire by using procedures that reasonably assured that existing prejudice would be discovered and an impartial verdict returned. *United States v. Hurley*, 746 F.2d 725, 727–28 (11th Cir.1984).

## 2. Failure to Grant Mistrial

Blanton argues that the district court erred in failing to grant a mistrial after the government allegedly injected prejudicial testimony ten days into the trial. The alleged prejudice arose on re-direct examination of Russell Barrett who testified under a grant of immunity. The government inquired when was the last time Barrett had met with Steve Blanton. Barrett responded that he and Michael Blanton had met six days before in Barrett's home but that the two had not talked about the trial. Barrett stated that Steve Blanton told Barrett's wife that "Nobody else was talking" leading Barrett to decide, at that time, not to testify either.

Immediately following this testimony, the government moved to revoke Steve Blanton's bond and the district court granted the motion.[28] All defendants then moved for a mistrial. The district court overruled the motion and none of the defendants requested curative instructions. Appellant Michael Blanton argues that the government intentionally instilled prejudice in the jury through testimony implying that his brother had tampered with or intimidated a witness. The government urges that the testimony was relevant to demonstrate a change in Steve Blanton's status as a government witness and that the evidence's probative value outweighs its prejudicial value under Federal Rule of Evidence 403. The government also argues that Michael Blanton should have requested a curative instruction to prevent the jury from making any prejudicial inferences.

■ We find that the district court acted properly in not granting a mistrial. Barrett's testimony was relevant to demonstrate a change in his status as a government witness.[29] The evidence was also admissible to show Steve Blanton's intent and consciousness of guilt. For these reasons, we find that the district court properly found that the testimony's probative value

---

**28.** Steve Blanton plead guilty the day following Barrett's testimony.

**29.** Prior to the encounter at Barrett's home, Barrett was to testify on behalf of the government. At trial, Barrett testified under a grant of immunity after invoking his fifth amendment rights.

outweighed its prejudicial value. In addition, there is no prejudice because the government made no connection between Steve Blanton's misconduct and appellant Michael Blanton. Finally, the alleged contact between Steve Blanton and Barrett occurred well into the trial so that the jury could not infer that Steve Blanton's actions were somehow in furtherance of the conspiracy charged in the indictment.

### 3. Judgment of Acquittal

Blanton argues that the district court should have entered a judgment of acquittal on his participation in the conspiracy as well as on the kidnapping and Travel Act counts.[30] He claims he did not have the requisite intent necessary to convict him of participation in the conspiracy and that there is insufficient evidence to support his other convictions.

 The government argues, however, that there is sufficient evidence to convict Michael Blanton of participation in the conspiracy and the various substantive counts. Our review of the record reflects that a conspiracy existed and that Michael Blanton played a direct role in furthering its goals. Not only did Blanton assist in the manufacturing and distributing of crystal but a number of witnesses testified that Michael Blanton delivered crystal to them.

We therefore find that Blanton's conviction under the conspiracy count is supportable.

 Blanton also argues that his convictions under 18 U.S.C. § 1952(a)(3) for participating in a trip to Pigeon Forge, Tennessee, was improper because he did not have the intent to assist the conspiracy in returning Brittain's auto to Georgia. He, however, admits that he made the trip. Again, the jury had sufficient evidence to conclude that Michael Blanton participated in the conspiracy and that his involvement on this particular trip was intentional.

 Next, Blanton argues that the evidence is insufficient to sustain the kidnapping and Travel Act charges against him arising from Wilkin's abduction because he (Blanton) did not actually travel interstate. Blanton's conviction on these charges may be based on his actions as a principal, aider or abettor, or a *Pinkerton* conspiracy theory.[31] Although the indictment identifies Michael Blanton as a principal under both counts, he can be found guilty as an aider and abettor pursuant to 18 U.S.C. § 2 even though the indictment did not specifically charge him as an aider and abettor. *United States v. Vines*, 580 F.2d 850 (5th Cir. 1978), *cert. denied*, 439 U.S. 991, 99 S.Ct. 591, 58 L.Ed.2d 665 (1978). We note also that the trial court properly instructed the jury on the law regarding aiding and abetting.[32]

---

**30.** The relevant provision of the Travel Act states that:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to— ... (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to [distribute the proceeds of any unlawful activity or commit any crime of violence to further any unlawful activity] shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

18 U.S.C. § 1952(a)(3) (1988).

**31.** We address Blanton's claim that the *Pinkerton* charge was erroneous *infra*.

**32.** The guilt of a defendant in a criminal case may be proved without evidence that he or she personally did every act involved in the commission of the crime charged. The law recognizes that ordinarily anything a person

can do for himself may also be accomplished through direction of another person as an agent or by acting together with or under the direction of another person or persons in a joint effort. So, if the acts or conduct of an agent, employee, or other associate of the defendant are willfully directed and authorized by the defendant or if the defendant aids and abets another person by willfully joining together with that person in the commission of a crime, then the law holds the defendant responsible for the conduct of that other person just as though the defendant had engaged in such conduct himself. Notice, however, that before any defendant can be held criminally responsible for the conduct of others, ..., it is necessary that the defendant wilfully associate himself in some way with the crime and wilfully participate in it. The mere presence at the scene of a crime or even knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime. You must find beyond a reasonable doubt that a

■■■ Under an aiding and abetting theory, the government must prove that the defendant in some way associated himself with the criminal venture, that he wished to bring it about, and that he sought by his actions to make it succeed. *United States v. Thomas*, 676 F.2d 531 (11th Cir.1982); *United States v. Schwartz*, 666 F.2d 461 (11th Cir.1982). The aiding and abetting statute allows the jury to find a person guilty of a substantive crime even though that person did not commit all acts constituting elements of the crime. *United States v. Pearson*, 667 F.2d 12 (5th Cir. 1982). Further, it is not necessary that one convicted as an aider or abettor commit the overt act that served to accomplish the offense or that he had knowledge of the particular means his principals employed to carry out the criminal activity. *United States v. Austin*, 585 F.2d 1271, 1277 (5th Cir.1978).

■■■ Despite the fact that Michael Blanton did not actually travel with the other defendants in transporting Wilkin across the Georgia–Alabama state line, the jury could have found Blanton guilty of the kidnapping charge as an aider or abettor. Although Blanton's mere presence with the other defendants during a portion of time the defendants were allegedly holding Wilkin against his will is insufficient to support a conviction, the record indicates that Blanton had the knowledge and intent necessary to support a kidnapping conviction. This evidence shows that Blanton associated himself with the kidnapping, participated in it as something that he wished to bring about, and sought by his action to make it succeed. *See United States v. Pedroza*, 750 F.2d 187 (2d Cir.1984), *cert.*

denied sub. nom., *Pelaes v. United States*, 479 U.S. 842, 107 S.Ct. 151, 93 L.Ed.2d 92 (1986). For instance, Wilkin's testimony that Michael Blanton guarded him for a period of time supports the theory that Blanton associated himself with the kidnapping and took affirmative actions to make it succeed. Also, Marvin Stafford, a methamphetamine dealer, testified that Michael Blanton stated that "we didn't have to worry about [Wilkin]" indicating Blanton's knowledge of the kidnapping. Record, Vol. 11 at 1143. Thus, the record provides sufficient evidence to support Blanton's conviction on the kidnapping charge under an aiding and abetting theory despite the fact he remained in Georgia during the course of the kidnapping.[33]

The final Travel Act count alleges that Michael Blanton and his co-defendants traveled between Alabama and Georgia to engage in the unlawful activities of manufacture, possession and distribution of crystal and the kidnapping of Wilkin. Although Michael Blanton did not actually travel in interstate commerce, his liability may be based on aiding and abetting liability or *Pinkerton* liability.

■■■ As just discussed, the jury could have found Blanton guilty of a substantive crime, in this case a Travel Act violation, under an aiding and abetting theory even though Blanton did not commit all acts constituting elements of the crime (such as interstate travel). In addition, a conviction for aiding and abetting under the Travel Act does not require that the defendants knew or intended that interstate facilities be used; instead, what the government must prove is not that the defendant knew interstate facilities were being utilized, but

defendant was a willful participant and not merely a knowing spectator.
Record, Vol. 15 at 1949–50.

**33.** For example, in *United States v. Taylor*, 792 F.2d 1019 (11th Cir.1986), *cert. denied sub nom., King v. U.S.,* 481 U.S. 1030, 107 S.Ct.1957, 95 L.Ed.2d 530 (1987), this court upheld the kidnapping and conspiracy to kidnap convictions of two men (King and Martin) who did not actually transport the victim across state lines but had knowledge of the kidnapping and participated in the kidnapping conspiracy. The facts in *Taylor* indicate that King and Martin

were principals in making the decision to kidnap and transport the victim. Both defendants argued that there was insufficient evidence on the interstate transportation element to support their convictions. The court based its sufficiency of the evidence analysis on the fact that King and Martin received a phone call from one co-conspirator who was detaining the victim in another state. The court therefore held that this evidence was sufficient to support the convictions. Thus, *Taylor* supports the conviction of Michael Blanton in this case.

only that the defendants knew they were facilitating an unlawful activity. *United States v. Vaccaro*, 816 F.2d 443, 453–54 (9th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 295, 98 L.Ed.2d 255 (1987). Thus, the fact Michael Blanton did not travel to Alabama does not preclude liability under the Act.

▮ The government, however, must prove that Blanton associated himself in some way with the criminal venture, that he wished to bring it about, and that he sought by his actions to make it succeed. *United States v. Pepe,* 747 F.2d 632, 665 (11th Cir.1984). A conviction under the Travel Act cannot stand absent proof the defendant aided a codefendant's violation of the act or caused the codefendant to engage in it. *Id.* at 666; *see also United States v. Davis,* 666 F.2d 195, 201–02 (5th Cir. Unit B 1982) (proof of one drug transaction and evidence of ongoing drug conspiracy sufficient to sustain conviction under Travel Act on aiding and abetting theory).

▮ The record indicates that although Michael Blanton was generally a minor player in many of the conspiracy's actions, he had the knowledge and intent necessary to establish that he associated himself with the interstate enterprise in pursuit of the crystal and the abduction of Wilkin. The evidence indicating Blanton's knowledge of and participation in Wilkin's kidnapping also supports a Travel Act violation. Because Blanton actively participated in Wilkin's abduction and the search for the stolen crystal at Jimmy Wright's home in Atlanta, he knowingly aided in the conspiracy's goal of retrieving the crystal for future sale. We therefore hold that the evidence was sufficient to establish Michael Blanton's guilt on the final Travel Act count under an aiding and abetting theory.

### 4. *Pinkerton* Instruction

Blanton also complains that the district court's *Pinkerton* instruction requires reversal of his convictions. We reject his contention and refer to our analysis of the *Pinkerton* instruction *supra.* We find there is sufficient evidence for a jury to have concluded that Michael Blanton either directly participated in the offenses for which he was convicted or that his convictions stem from his active involvement in the conspiracy. Under the latter *Pinkerton* theory, we find no prejudicial error in the district court's failure to provide the "reasonably foreseeable" portion of the instruction. We, therefore, affirm the district court.

### 5. Character Evidence

▮ During the trial, Blanton called witnesses to testify to his general character for non-violence and peacefulness. Blanton states that the district court erred in failing to give a full instruction on this evidence of good character. The district court's instruction was:

> Now evidence has also been offered of one defendant's good character, and such evidence may give rise to a reasonable doubt. So where a defendant has offered testimony that he is a non-violent citizen, the jury may consider that testimony along with all the other evidence in deciding whether the government has proved beyond a reasonable doubt that the defendant wilfully committed the crime of violence that is charged.

Record, Vol. 15 at 1931.[34] Blanton objected to this instruction. Record, Vol. 15 at 1957–58. We find this instruction was adequate to instruct the jury on its use of Michael Blanton's character evidence. The district court's instruction makes clear that the jury may consider character evidence in determining Blanton's guilt beyond a reasonable doubt. The district court's instruction was not erroneous.

AFFIRMED.

---

**34.** This instruction is substantially similar to those contained in Pattern Jury Instructions, U.S. Eleventh Circuit District Judges Association, Special Instructions, p. 11 (1985).